835. Counsel? Morning, your honors. May it please the court. Pete Patterson for the appellant, Brian Range. I'd like to reserve five minutes of my time, if I could. That will be granted. Thank you. Decision in Rahimi reinforces this court's earlier decision finding section 922 G1 unconstitutional as applied to Range. First, Rahimi rejected the government's argument that as a matter of plain text, the Second Amendment is limited to responsible citizens. And for the same reasons, this court should reject the government's argument that the Second Amendment is limited to law-abiding citizens. That term is equally as vague as responsible, and it was used in the same way in Heller and Bruin as was responsible. Second, Rahimi found a historical tradition of temporarily disarming those who threaten physical violence to others. Here, Range is being disarmed permanently, and the government admits he has never threatened physical violence to anyone. The government nevertheless argues that Rahimi supports its position, but the government is incorrect. One, the government says that it can disarm dangerous individuals. But of course, as we've argued, that principle has no application here since Range is not dangerous. So the government's argument boils down to the fact that it can disarm non-dangerous individuals who share a characteristic with other individuals the government contends are dangerous. But that cannot be right, and it would lead to startling results. Could the government disarm anyone under 30 or anyone living in a high-crime neighborhood? Surely not. And history does not support that proposition. The government, for founding-era evidence, cites primarily to laws disarming those who provided material support to the British during the American Revolution. But those are not valid analogs for several reasons. One, those individuals were viewed as having written themselves out of the people. Two, they were dangerous by supporting the enemy during wartime. Three, those restrictions typically were temporary, allowing people to swear an oath and get their rights back. And four, Bruin footnote 26 says that military measures are not valid analogs. Wartime measures, I'm sorry. We can see that in a letter from General Washington, cited by the government supporting these measures, where General Washington said, vigorous measures, such as another time would appear extraordinary, are now become absolutely necessary for preserving our country against the strides of tyranny making against us. The government's second argues that it can disarm serious offenders. But serious suffers from many of the same vagueness concerns as law-abiding and responsible. It also is disconnected to the principles underlying the Second Amendment. Rahimi says the Second Amendment is consistent with common sense. And it makes common sense to say if someone threatens violence to another person, that person has forfeited their right to armed self-defense. But it does not make common sense to say that someone that has committed a serious crime, disconnected from violence, has somehow forfeited their Second Amendment rights. This also is not supported by history. The government points to the fact that some felonies at the founding were capital offenses. But that can't support the government here, again, for several reasons. First, this could have startling implications as well, as nothing in principle would separate the Second Amendment from any other right being stripped of a felon for life. And as this court held and explained in its prior opinion, the fact that some felons were subject to capital punishment at the founding says nothing about what their rights were, what the rights are of felons who serve their time and return to society as free individuals. And also, if this were a valid principle, the principle would be something like individuals subject or who commit an offense subject to capital punishment can have their rights taken away. But we would apply that principle to today's circumstances. It would be individuals who commit capital offenses today. But this is all somewhat hypothetical, because here, Range's offense was a misdemeanor. And a misdemeanor has never been a capital offense at the founding or today. I welcome the court's questions. You mentioned, Rahimi, by my count, twice. Does that change anything analytically? Does that opinion change anything analytically from that's in our first opinion? I don't believe so, Your Honor. I view Rahimi as just an application of Bruin. And similarly, this court's earlier opinion is the same. Thank you. You say it doesn't change anything. What about methodology? I mean, we're supposed to look now not just to the analog of one offense to another offense, but the court seemed to make clear in Rahimi that we're to look to principles that underlie the regulation at issue. And in doing that, where we have the combination of the death penalty laws and the group disarmament, that combination of methodologies has been enough for at least two of our sister circuits post-Rahimi to conclude that nonviolent felons are properly the subject of 922 G1. Why shouldn't we hold the same given that change in methodology that seems to be inherent in Rahimi? Respectfully, Your Honor, I don't think there was a change in methodology. Bruin talked about how and why. I think that's basically the same as looking to the principles and applying those. And with respect to those laws, those group disarmament laws, with respect to Native Americans, African-Americans, and Catholics, the government disclaimed relying on those laws in Rahimi expressly and said that goes to show more of the scope of the right. Who's a member of the people? Those individuals aren't members of the people. So we don't even get to the historical analysis. Whereas, Range is a citizen of the United States. So those aren't valid analogs for disarming him. The only really valid analogs would be the same traditions that Rahimi relied on in terms of the Afray and going armed laws. Those required individualized determinations that someone was a threat of violence and they were only temporary. So if anything, Rahimi, by identifying that principle, doesn't help the government at all. It doesn't identify any other principle that would help the government that would somehow change the outcome of this court's prior determination. Well, one of the principles they seem to grapple with is the notion that the greater does include the lesser. The opposite of what we had said in our initial opinion, en banc opinion of this court. And if that's so, taking the court at face value, then if historically we had things like counterfeiting or theft, crimes of deceit that were punishable by death, why wouldn't that also include the lesser of not just a deprivation of your right to bear arms, but even a permanent one? Well, it's very important to focus on precisely what the court said there. What the court said is that if someone could be put in prison on account for their threat of violence to another person, we can take the relatively lesser step of disarming them. What they didn't say is if someone was put in prison for any reason, we can disarm them. And that would be what the greater include the lesser argument would be here, would be that because someone could have been subject to the founding to this sort of punishment, then we can impose any punishment on them. And again, as I said, that would have startling consequences. There would be nothing limiting that to the Second Amendment. It would be you could strip then someone, okay, they commit an offense analogous to a capital offense at the founding, then presumably you could strip them of their First Amendment rights, their Fourth Amendment rights and everything for life. And surely that cannot be correct. So are you acknowledging that there is a loss of your Second Amendment rights after committing a crime where there's at least a sentence in place? In Moore, for example, we extended that through a period of supervised release. Certainly if an individual's in prison, in Moore, that individual that was on supervised release had a specific firearm prohibitor order, which to require, to impose that requires finding that person is a danger to the public. So I might argue that even here, Range couldn't have been validly disarmed at the time he was on probation. But even if that were incorrect, he finished his probation in 1998. So it says nothing about whether he could be disarmed now. So is that to say that there's a loss of a Second Amendment right, and then there's a restoration of that right at some point after the conclusion of a sentence? Well, again, my primary argument here is that Range never lost it. What I would say is consistent with what Justice Barrett said, is that people are a member of the people, they retain their Second Amendment rights, but they can have those Second Amendment rights limited for certain reasons. And so one principle is they can have them temporarily limited on account of them being a violent threat to another person. And it's not necessarily that they turn off and turn on, but just that in certain circumstances, the government will have a right to limit that person's rights. And in Moore, this court said, someone on a period of supervised release. But here, there is no principle that would allow someone that committed a misdemeanor offense that happened to have been eligible for punishment up to five years, 30 years ago, that is not in any way connected to violence to say that 30 years later, and with no end in sight, now that person can continue to be disarmed. Again, it is not consistent with the principles underlying the Second Amendment. There would be- Reconciled that position with the Fifth Circuit's case in U.S. versus Diaz, which is a post-Rahimi case. Yes, I think the Fifth Circuit went astray in that opinion. And frankly, I think they committed the same error as in Rahimi, where they were looking at specific founding era applications instead of looking at the principles. So as I said at the outset, if there's a principle that someone who has committed a capital offense can be disarmed, we would need to take that unchanging principle and apply it to today's circumstances and say, has someone committed a capital offense today? I thought we were supposed to look at whether the offense conduct at the founding was the kind of conduct that would have led to the disarmament of an individual. No, I don't see- Are you asking us to apply the contemporary view of what the punishment would be for the very offense that the founder said would have resulted in estate forfeiture? Well, it depends- Or capital punishment. It depends what the principle is. If the principle is, as in Rahimi, okay, what treatment was given someone who violently threatened someone else with firearms? Then yes, I admit you would look at that at the founding. But here, it seems to be a somewhat broader principle to say, okay, what sort of things can we do to people who commit capital offenses? And if that is the principle, you would need to apply that principle today. But in the event, as I said- I wanted to look at the punishment under certain circumstances. And in other circumstances, we're supposed to look at the offense. We're supposed to look- And how the founders treated it? We're not supposed to look at how the founders treated the offense. So if the government were to have something on all fours, it would be, okay, because people committed a felony, they were disarmed. Because people engaged in some activity, they were disarmed. But there is nothing of that sort in the historical records. Right, you don't have to be on all fours. Right, you don't have to be on all fours. So then, the next step was to say, is there some broader principle? And then I take the government to be arguing, and Diaz to be arguing, if an offense is analogous to something at the founding was capital, well, then we can disarm. Wouldn't this be an analog to deceit at the time of the founding? The closest analog the government has come up with was obtaining money by false pretenses. 3 King George II, chapter 24, from 1757, that was not a capital offense. So this principle does not even apply. Does it have to be a capital offense? Well, unless the argument is, anybody who commits an offense that is subject to any terms of imprisonment. Does it not? Excuse me? It has to be an offense by which you would have been disarmed, does it not? Well, yeah, I would say it would have to be an offense that he would have been disarmed and disarmed permanently, and that he would not have been disarmed permanently at the founding. And again, this is also a misdemeanor, and he would not have been disarmed at all. How would this have played out at the founding? Would he have been disarmed, and then he had to come back and ask that his rights be restored? How would this have played out at the founding? I don't believe he would have been disarmed at the founding. Most of the disarmament laws at the founding were either, if someone committed a felony offense, usually they forfeited their entire state. That's what Blackstone said. It's a felony. I understand that Pennsylvania misdemeanors can go up to five years, but this is a felony offense, right? So if we were to, well, it is a- It's a felony offense. It's a felony equivalent. It's felony equivalent under federal law. It would not have been a felony at the founding because the definition of a felony at the founding, according to Blackstone, was a state forfeiture. And there's no state forfeiture with this. I don't believe there was a state forfeiture with the obtaining money by false pretenses statute that the government decided. But even if this would have led to forfeiture, if it was not a capital offense, that would have just been forfeiture of the items he had at the time of the conviction, and then he would have been free to reacquire whatever he wanted to reacquire once he had finished his sentence. How would he go about reacquiring at the founding? He would presumably gain employment and start making an income, and then he could obtain firearms and any, again, it's a state forfeiture, so anything else that he had been deprived of at the time of the conviction. Mr. Patterson, I didn't have a chance to talk to you the first time you were here, but listening to your argument in Range 1, you discussed the idea of public danger and private danger. And whether it be the death penalty or just a term of imprisonment or other punishment, does a legislature's prescribing of a sentence reflect the legislature's assessment of the public and private danger posed by the offense? Yeah, no, I don't think so, Your Honor. There could be many reasons why a certain act could be illegal apart from danger. So, obviously, to protect the public fisc is a- But I'm not talking about why it's criminalized, I'm talking about the punishment, whether it be a year or characterizing it as a misdemeanor or whether it be a death sentence. Does the extent of punishment reflect an assessment of public or private danger, or both? Not necessarily, that could be one element, like presumably that murder, that explains a lot why it's subject to severe punishment, but for an offense like this, that's wholly disconnected to any sort of danger, I don't think the punishment that's selected is at all connected to danger. And you're using, when you say wholly unconnected from danger, you mean that in both the public and private sense, as you put it in Range 1. In every sense of the word, and when I said public and private danger, I meant danger of violent conduct. That's the sort of danger that the Second Amendment is concerned with, and again, this is what the principle that Rahimi said, that the Second Amendment is consistent with common sense. The Supreme Court has called the Second Amendment to protect a basic right to self-defense. So, in order to take away that basic right, it makes sense if it's someone that has shown themselves to have committed the type of act that requires that sort of right. Okay, it makes sense to say that we're going to say they've forfeited their right, but if it's someone who's committed an offense and whether it's serious or not, whether we characterize it that or not, but it's wholly disconnected from any danger of violence to anyone, it makes no sense to say somehow that person has forfeited their basic right to self-defense. And as to Judge Schwartz's question last time, you had said it's not necessarily violence in itself, but the potential for violence, as posed by her cybercrime example of hacking into the federal government. Yeah, there can be crimes closely associated with violence, and the Sixth Circuit in Williams kind of laid out that typology to say there are some crimes that are violent, murder, rape, those sorts of crimes, and then there are some crimes that are inherently connected to violence, such as drug dealing. I saw this court has etched on its wall downstairs the right to sue and defend in the courts is the alternative to force. And in an offense like drug dealing, you can't go into court, so there is no alternative to force. So those types of offenses are closely associated with violence. And so are you in agreement with the Williams court's first and second categories as dangerous? I generally, and the Williams court said here that fraud type of offenses likely are not in either of those categories. Just to understand how far you would go with the first and second category and where your agreement is, is your agreement on temporary disarmament or permanent? I think in all circumstances, a person would have a right to bring an as applied challenge. So the way I look at it under Bruin is that the government has the burden to come in and say, okay, we validly disarmed this person. And without more, if the government comes in with, okay, this person has committed murder, this person has committed an aggravated assault, this person has engaged in drug dealing. That means, I think without more that meets the government's burden. But then if the person can come in and say, well, that's 30 years ago and my life has revolutionarily changed. I think the person would have the opportunity to do that. And then it would be up to the district court judge to make findings as they do every day and supervise release and other sorts of sentencing to determine whether somebody continues to be dangerous. Mr. Patterson, the federal government has jurisdiction to regulate firearms under the Commerce Clause. Wasn't it your requirement, your burden as plaintiff here to demonstrate that the firearms that Mr. Range wanted to acquire had been involved in interstate commerce? Other than that, how does the government have jurisdiction of this case? Well, under section 922 D1 of the code, it's illegal for anyone. But that is with the proviso that the federal government can regulate gun, control guns only as they affect the Commerce Clause. Other than that, it's strictly a matter of state law. So that's why we see in all these federal prosecutions and in many of these gun possession cases that there has been a showing that the firearm involved moved in interstate commerce. Well, here, Range has stated he would go into commerce and acquire a rifle and acquire another gun for defense of his home. But wasn't a gun that had moved in interstate commerce? Well, he can't do that because he hasn't identified the specific gun that he would purchase, but he said he would go to purchase a firearm under 922 D1. No one can sell him a firearm regardless of whether it's moved in interstate commerce if they have reason to believe he's subject to this prohibition. And so what happens when he prevails here is the government, and what happened after this court's decision, he gets something called a unique personal identification number that goes into the background check system so that when he goes to the gun store to purchase a firearm, it doesn't come up that he is a prohibited person, and therefore that person, and he'll come back with a clean background check, and therefore that person can sell the firearm to him. It's not clear where he could, given those federal laws, where he could get a firearm. He would have to- He did have a firearm, and when he found out he was forbidden to have one, he turned it back. Correct. Couldn't he have pled that that firearm had moved in interstate commerce? I'm not saying that it is an impossible case to plead, but haven't you failed to plead an important element of the case in that the firearm affected interstate commerce? I don't think so, Your Honor, and also this would have been an argument for the government to have made that they have forfeited. What the government said is they admitted that the only reason he doesn't acquire a firearm is due to a reasonable fear of prosecution under section 922 G1, that's at appendix 173. So nobody is contesting that he has pled enough to say this federal law is prohibiting him from acquiring a firearm. But I am protesting. Your Honor, you're protesting. I'm understand, I didn't mean to suggest no one, I meant none of the lawyers in this case, but as I've just explained, those federal laws, which absent challenge are presumptively constitutional, are right now preventing him from purchasing a firearm. If I may, I'd like to follow up on some questions asked by the Chief, Judge Chigueras, Judge Crouse, and Judge Schwartz. The Chief asked, what's different? You know, what's changed since our previous opinion in this case with Rohini? The line that changed the most for me, and this is kind of where Judge Crouse asked, is the line that says, we're looking at whether the challenge regulation is consistent with the principles that underpin our regulatory tradition. The site for that's Bruin, but I confess, when I read Bruin, I didn't see that quite so clearly in Bruin. So I think that's probably some sort of change. And then Judge Schwartz asked a question about, well, look, are we looking at the nature of the offense, or are we looking at the punishment that kind of comes with that offense? Are we looking at this as a fraud crime and looking for a regulatory tradition with respect to fraud, or are we looking at regulatory tradition with respect to length of punishment over a year? So I guess I'd kind of, putting those three questions together, maybe, and trying to focus them a little bit, what are we looking at for the comparable regulatory tradition? Is it fraud cases, or is it cases where there is, the principles underlying fraud cases, or principles underlying punishment over a year, or is it some sort of awkward combo of both? I think you're looking at the person. And so has this person done something that, consistent with our historical tradition, would result in forfeiture of his Second Amendment rights for life? And so the only thing the government has to point to to say that this person has done something of that nature is that 30 years ago, on a food stamp application, he omitted some law-knowing income. Mr. Patterson, you have used repeatedly in your uninterrupted time and in answering some of these questions, the word principles. And you just had your attention drawn to that quote on slip opinion at seven. The appropriate analysis involves considering whether the child's regulation is consistent with the principles. So it doesn't seem like an answer to say you have to look at the person. We're being told, look at the principles. So if that is the test the Supreme Court has given us in Rahimi, what are the principles that we should be looking at here that prompt you to say nothing meaningful has changed in Brian Range's case? Right. And so, I'm sorry I was slow to get there, Your Honor. I was setting it up to say that, okay, this is what Range has done. What principle at the founding would allow the government to disarm someone like that? And it's the government's burden to come up with that principle. I'm not aware of one. The principle that I'm aware of is that someone who threatens physical violence to another person can temporarily be disarmed. Can I just focus back on my question a little bit? Because principles is huge and run with that as much as you want. But principles is modified by the phrase that underpin our regulatory tradition. And I guess what I'm trying to figure out is what should we read regulatory tradition to mean? Should we mean regulatory tradition to mean crimes, analogous regulatory tradition involving crimes of deceit or fraud or regulatory tradition with respect to length of punishment? Because it feels that when we want to know what principles to look at, we're only looking at those that are consistent with our regulatory tradition. And I want to know what's the relevant regulatory tradition that we should be looking at. Well, I don't know that the Supreme Court has put a limit on it, but the government has pointed to two principles that they say are consistent with our regulatory tradition. One is that they say people who commit serious crimes could be disarmed. But we've shown that is not true. That committing a serious crime, even if it was labeled a felony, did not disarm someone for life. And we can see this by the difference, the distinction between voting rights, which are civic rights, and firearm rights, which are individual rights, as Justice Barrett laid out in her canter dissent. There were many provisions saying that individuals that commit serious crimes, felonies, couldn't vote. There is not a single law saying that someone commits a serious crime cannot possess a firearm. And then the other principle that the government has adverted to is that they've said that people that are dangerous can be disarmed. And of course, as we say, range isn't dangerous. But they say, well, we can draw a broad brush. But the law that they cite, I believe they've disclaimed the Native American, African American, and Catholic laws. So the only thing they point to at the founding is treatment of non-associators and people who aided the British during the American Revolution. But that is not an analogous circumstance because those individuals also weren't considered part of the people. They also were dangerous. Those were temporary things. And they were wartime measures. And Bruin said, we don't look to wartime measures. So those are the two principle, those are the regulatory traditions that the government has pointed you to. And neither of those is valid. And so there is no, therefore, under the rules of party presentation as the Supreme Court has laid them out, there is no regulatory tradition in any context that would support disarming someone like Brian Range. All right, counsel, we'll hear you on rebuttal. Thank you. Thank you. And we'll hear from your friend. Good morning, and may it please the court. Kevin Soder from the Department of Justice for the government. In its recent decision in Rahimi, the Supreme Court clarified the historical tradition test that governs Second Amendment claims. Several aspects of the court's reasoning underscore that the longstanding federal law of disarming felons passes constitutional muster. And I'd like to briefly emphasize, I think, three key messages from Rahimi. And in each respect, I think it's particularly helpful if you look at the majority opinion and then contrast the sort of historical analysis the majority does with the way that the dissent thinks about historical tradition. The first thing that is helpful to glean from Rahimi, I think, is that it clarifies at what level you conduct the generality to draw lessons from history. You look for the principles underpinning the historical laws, as Judge Phipps mentioned. And you look at that as a whole, and you look at the laws taken together. You don't just go one by one, picking through differences between the modern law and the historical one. Second, I think Rahimi clarifies helpfully the court should be very careful not to make the following flawed inference from what you might consider historical silence. The inference would be, well, the founders addressed an analogous problem for materially different means. So it follows that the challenge law is unconstitutional. I think that's very similar to what the dissent said in Rahimi. And it's also what I just heard Mr. Ranges' counsel say, saying that there's not a single law similar to this one that you can find at the founding. That's not what the majority opinion requires. And I think Justice Barrett helpfully explained what the right understanding of the reason why we're doing this inquiry in the first place under originalism is in her concurrence. She explained historical regulations are revealing a principle, not a mold. And to be consistent with historical limits, a challenge regulation need not be an updated model of a historical counterpart. This is because the Constitution doesn't force 21st century regulations to follow late 18th century policy choices. And to hold otherwise would be to assume that founding our legislatures maximally exercise their power to regulate. And that's the sort of use it or lose it view of legislative authority that the court has never adopted. And then the last point that I think is helpful to pull from Rahimi that's also come up in some of the discussion today is that there are some key passages that are particularly relevant when you're analyzing felon dispossession statutes. And I'd like to point to two. The first is the one that's been discussed a bit already where the court said, quote, if imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that section 922 G8 imposes is also permissible. And I think that shows that it's appropriate to look to how the founders responded to criminal convictions for felonies in determining whether Congress's decision over the last 50 years in this federal statute and more longstanding decisions that date back about 100 years is consistent with historical tradition. And then the last point I think that's helpful to keep in mind is the court not just repeated Heller's statements about the Supreme Court's cases not casting doubt on the constitutionality of longstanding felon dispossession prohibitions, but it also relied on those statements at two points in its decision to support its historical analysis. And as Justice Kavanaugh summarized in his concurrence, these passages from Heller reflect that the Supreme Court has already, quote, recognized a few categories of traditional exceptions to the right. And felon dispossession laws are one of those traditional categories. I welcome the court's questions. So thank you for focusing on Rahimi. How does it change our first opinion? So I think there are several ways that we've gone through in the brief in which these principles that we were just talking about affect the first opinion. One is the specific analysis of capital punishment laws, but two, I think a broader point is that what you're looking to history for is to figure out what the principles are. And I didn't see in the previous opinion an explanation of why there are not principles that support the application of the felon dispossession law that operate at sort of the right level of generality. Your remarks embraced as Justice Barrett's concurrence. She ends that concurrence by saying the right level of generality is the principle is physical danger. Why isn't that the appropriate principle here as well? So I think we've explained why it's not. And of course, we may well part ways with Justice Barrett's analysis on the right level of generality for felon dispossession laws were those laws to end up before the Supreme Court. And here, I think that when you look to the laws as a whole at the founding and you look to these two different principles that we've drawn out, there are two that are not quite as specific as danger. There are the serious crimes principle and the sort of categorical judgments about danger principle, which I think Justice Barrett also recognized when she was then Judge Barrett in her Cantor opinion. And so looking- Tell us what a serious crime is. So Congress made the decision that a crime is serious for that purpose if it is punishable by more than a year of imprisonment. That's a decision or that's an understanding of felony that goes back more than a century. If that's been called into question, assume for the moment that's off the table, what would be a serious crime generically? So I think that that points out the problem. There is a match between the historical principle of serious crime and felony level punishment. I don't know what principle would have the court go about dividing up crimes in some other more granular way. I mean, if you were to try to look at, I think some of the discussion that's happened and some of the way that the district courts in this circuit have seemed to have understood this court's prior decision is that you basically look at whether if you took the offender back to the founding, what would have happened to them. But that's the kind of thing that led the district court in the Harper case to hold that someone with 13 felony convictions, including five for robbery and four for drug trafficking, is, cannot have this law constitutionally applied to them. That's what courts are understanding this court's prior decision to mean. Well, isn't that exactly what Justice Barrett was doing? She said, whatever else you have to think about, we know this kind of crime, violent crime, that's the, and that's the right level of generality. To just say it's anything, quote, serious, unquote, you've just ramped it way up the ladder of abstraction. How is that consistent with searching out principles? If you just, if the answer is, it's serious, and serious is anything that any state gives you a year and a day for, how is that consistent with founding-era principles? I think it's consistent with the founding-era principles that a crime that is serious enough, and it need not have violence as an element, and it need not have the sort of specific connection where you connect the offender to danger, I think if you were to require that, you end up in the sort of open-ended, standardless inquiry. Didn't the Rahimi court just say that then? Why didn't they say, you know what, it was a year, it was a year and a day, so we're done. They didn't do that. How is what you're arguing for consistent with what the Supreme Court did in Rahimi? So in Rahimi, the court was dealing with a different law. There was no felony conviction for Mr. Rahimi, as the Fifth Circuit had pointed out in its decision, which differentiates his case from this case. There was an individualized finding that he himself was dangerous going forward, and the Supreme Court- And does the individualized finding process that Rahimi recited apply to all the 922G prohibited person categories? We know the statute tells us that you can seek restoration of your rights if you're convicted, going through the parting process, state process, if 925C were funded. Rahimi court did an individualized inquiry, you just said. Does that, is the court telling us that's the process to apply for all the prohibited person categories? No, not at all. I think what the court was doing was looking at the provision that was before it and recognizing that the text and meaning of that provision involved an individualized determination for that person. It expressly saved for another day the question whether legislatures can make categorical judgments based on dangerousness, and that's the sort of judgment that is reflected in section 922G1. Let's say that- Hold on, Judge Porter's been trying to get me in. Let's say that Pennsylvania decided that jaywalking or failing to return library books is a felony. Would those offenders be permanently disarmed under Rahimi? So under the statute, those persons would be disarmed at the time of their conviction, and as Judge Schwartz mentioned, there are mechanisms in the statute for getting relief from that disability on the back end. Since when has 925 been funded? So 925 has not been funded since 1992. That was Congress's determination that as a policy matter, this was not a good idea to have individual felons coming into court, sorry, coming into an executive agency and trying to convince them that the person wasn't dangerous. And what Congress found was that, quote, too many of these felons whose gun ownership rights were restored went on to commit violent crimes. So how do you get your gun rights restored then? So today, as the statute stands, the restoration mechanisms available include expungement, pardon, having the conviction set aside, and having civil rights restored. Fair enough. Steve Peele declined. Can I follow up there? What's the principle that you find from the country's regulatory tradition that would allow the Congress to even temporarily disarm a jaywalker or someone who fails to return library books simply because that conduct has been determined to be a felony by a state legislature? I think, yes, the principle is that the level of generality to look at in thinking about what the modern law is, and keep in mind what the element of the modern law is. It's conviction for a felony. That is the right level of generality to be thinking about this law at. You are not carving it up into individual felonies, in which case I think what you will see down the road and what's sort of coming to you if you're doing this on an offense-by-offense basis is district courts, prosecutors, defendants being very confused about what offenses fall on which side of the line. And I think- Well, your principle for it being serious, you say death was a standard penalty for all serious crimes. You quote Banner. But if you look at that quote from Banner, it's at the end of a, it's the concluding paragraph of a chapter that is basically about pre-founding law. And if you look to just 80 pages later in Banner, he talks about the efforts of various states to decapitalize offenses that are, quote, for lesser felonies, and mentions quite a few, most of them which are in the Moore opinion and which were pre-founding, were for counterfeiting, forgery, et cetera, were not punishable by death, and were sufficient to find a tradition in Moore. If you look further at post-found, or post-1791, you can add, so I count, this is a non-comprehensive, but Connecticut, Massachusetts, Pennsylvania, and the Federal Crimes Act of 1790 all decapitalized offenses like counterfeiting, forgery, perjury. Now, there is counterfeiting for public securities, but there's also a non-capital federal counterfeiting statute in the Federal Crimes Act. Horse stealing, decapitalized burglary without aggravating factors. After the 1790s, you can add New Jersey, Virginia, and Kentucky. So I would like to know, given those examples, both pre- and post-founding, can you give me a comprehensive view of the state of what was a capital offense that was non-violent, and why those do not counter a, quote, tradition of serious non-violent offenses always being punishable by death? If I could take the last part of your question first. I think it's helpful to take a step back and think, why are we looking to the founding in the first place? We're looking for the principles that underpin the regulatory tradition, and we are looking to figure out, basically, what the question that the D.C. Circuit answered in Medina was to think, if the founders had been told, someone who's convicted of a non-violent felony is going to be released from prison, would it be okay for a legislature to say, you know what, we're gonna make the judgment call that that person can't have firearms in light of their felony conviction? How would it mitigate for temporary, and 922g1 is permanent? So 920, I would say 922g1 is indefinite. I don't wanna get into a debate about terminology, but it does have these avenues we're talking about, and I think to the extent the court's concern is the duration of the ban, rather than it's being put into effect in the first place upon conviction and upon release from any conditions like the probation here, I think that's not something that was stated in the court's previous decision, and that's not something that is how it's been understood by other courts. You have the 9th Circuit panel in the case that's now on bunk in the 9th Circuit, Duarte, saying that you can't disarm someone for a number of convictions. I think they were for possession of a controlled substance for sale, in addition to already being a felon in possession. My colleague certainly emphasizes the temporary portion of Rahimi, and Rahimi did seem to emphasize the temporary nature as well. So I think that my colleague, at least in the previous argument and in his briefs, and today I think, said that his position is that Mr. Range could not be disarmed from the outset ab initio. I think that if that's what the court was holding the last time, I don't think that's sort of how some courts have understood it. I think that's how other courts have understood it. I think there's just quite a bit of confusion happening and quite a burden on the district courts within this circuit and the litigants within this circuit, trying to figure out what this decision means and what they're supposed to be looking for. Are they supposed to look at how the principles that do clearly support the felon dispossession law in other cases? Are they supposed to look at how that operates today? Or are they supposed to try to go back to the founding and see how a similar person would be treated? Are they supposed to redo a historical analysis each time? Or is there some principle that is out there that says you can disarm most felons if it's not all felons? But whatever it is, I think there's just quite a bit of confusion. So are we supposed to look at the offense at issue and see whether or not at the founding that was a crime and how that crime was punished as a package? Or as your adversary was suggesting, we should look at how capital punishment was being meted out and who faced it. And is that the same now? I think those are both much too granular of a level of generality. That comes very close, I think, to the type of analysis and maybe is exactly the type of analysis that the Fifth Circuit did in Brahimi and that the dissent in Brahimi did, where it said, well, this law deals with domestic violence. At the founding, people who committed domestic violence could go on possessing their guns. Therefore, it follows the founders could have enacted this type of law. They didn't, so it's unconstitutional. So your seriousness starts to sound a lot like the responsible person language you trotted out the first time. The court rejected those words. You retreat from the words, but you're hanging on to the principle. Why isn't the right level of generality the one that the court repeats about two dozen times through its opinion, which is physical danger, physical safety? If it says it over and over again, why isn't that the best touchstone for our opinion? Brahimi was dealing with a different law. And of course, that principle matched the law that was at issue in Brahimi. And our point here is that there are different principles. One is related to danger, but it's the broader principle about categorical judgments by legislature. And then there's the separate serious crimes principle. Why shouldn't we, in looking at a way to set some threshold for what constitutes a serious offense, look at something like Diaz did, where the Fifth Circuit was looking back to at least broad categories of crimes at the founding. If you were to engage in theft from the government treasury, and that is something that is punishable by death at the founding, that gives us a way to think about those kinds of offenses as being serious offenses. Would that be a workable approach, or would you not even endorse that approach as a way to think about what differentiates serious from non-serious felonies, if that line can be drawn? I think that would be neither workable nor principled. What the Supreme Court has repeatedly said, and what I think Brahimi illustrates, is that once you extract the principle from history, you then apply it to modern circumstances today. What's the principle that we should extract given our circumstances? Do we have a, you know what the crime of conviction is? What's the principle that we're supposed to extract from our regulatory history, and how does it apply? The principle is that serious crimes can be punished with disarmament. The application is that section 922 G1 is constitutional as to Mr. Range, because the legislature determined that the crime was punishable by more than one year of imprisonment. And the legislature gets to decide what's serious. So the legislature gets to decide what's a felony, as it always, as it does in any other context. Are you using serious synonymous with felony? We're saying that felony is the modern application of the serious crime principle. And there are a number of reasons why- So what is a misdemeanor felony equivalent? So if the court finds- Is it felony? Is it misdemeanor felony equivalent? Is it serious? What is it? So it's punishable by more than one year, which is the common understanding of felony today. There are several reasons, I think, why that is an appropriate line to draw and why Congress drew it in the right place. If you look to other constitutional provisions, like the two in the Bill of Rights, the- Well, but the workable, what I hear you saying, and correct me if I'm wrong, what I hear you saying is what's workable is to just let the legislature define what's a felony, let the legislature define what's serious, and then go with that. So it's certainly workable, but it's also the right principle to draw from history. Also the right principle, if that's true, what was the Supreme Court's purpose in Bruin and Rahimi? I mean, the analogical, that seems to just jettison the notion of analogical reasoning. Because what you're really saying is, if the legislature says, to use Judge Porter's example, that jaywalking will get you a year and a day in prison, that is definitionally a serious crime, and you can be disarmed for life for that. Because that's what the legislature of state X happened to say as the punishment. If that's really the operative law, what's the purpose of talking about analogical reasoning and looking for principles? Because clearly, you know, walking across Chestnut in 1787 was not gonna get you disarmed for life. I don't think that's a, that's not a straight-faced kind of argument. So how can what you're saying comport with the Supreme Court's direction that we're to look for principles underlying our regulatory traditions? So I think when you think about what this law is doing, this law is reflecting Congress's judgment that being a felon is what disarms you. And there are a number of felons who- No matter what, no matter what the actual action is, no matter what it is, if some state somewhere gives you a year and a day, that automatically qualifies for constitutional purposes as meeting the analogical reasoning test that we're instructed to follow. That's the government's position. I think that's the position that Congress took when it enacted this statute, and it recognized that that was unprincipled. Right, and it's our job to decide whether what Congress did is unconstitutional. Doesn't there need to be a mechanism for judicial review there? I mean, if failing to return a library book was classified as a felony, and someone is sentenced to prison for two years for the late return of a library book, if they were challenging that in the court, we would have the power to review that and consider whether it was excessive punishment, consider whether it violated the due process. There would be a mechanism for judicial review to test the seriousness of that offense. Why shouldn't we think of this in the same way? I think that those mechanisms are available, and the point is that when Congress enacted this law and it applied it to both federal and state-equivalent offenses, it was consistent with the federalism principle that it's not going to step in and carve up crime by crime which crimes it thinks are the most serious felonies. It's decided that the most serious crimes it's going to pick is going to be felonies. It's excluded all crimes punishable by less than a year in imprisonment. It's excluded certain state law misdemeanors on the belief that punishable between one and two years is not the type of serious crime that Congress was trying to target, but it's made the determination that felony as it is in connection with construing the Fifth and Sixth Amendments, the maximum punishment is the right line to be looking at for the constitutional analysis. How do you have jurisdiction of this case if there has been no showing of record of effect on interstate commerce? So we haven't contested the plaintiff's standing in this case. You concede that Range does not pose a credible threat to anybody's physical safety? So I think it's important to keep in mind how the record in this case was compiled. This is a case that was litigated when Binderup was the controlling law. The district court decided the case on the basis that Mr. Range's crime of conviction was not serious under the multi-factor test of Binderup. And in the course of doing some discovery just to try to understand how that would be litigated, Mr. Range asserted in his declaration that he's never engaged in violence, never threatened anyone with violence, et cetera. We deposed Mr. Range. We found no specific evidence to rebut that. What we said is that we currently have no evidence to the contrary of that. But I think if you. That's a yes. I think that's a yes, right? It's a, we don't have. Well, why don't you answer it this way then. Where in the record is there any evidence to suggest that Brian Range poses a credible threat of physical violence to anybody? I think if you look at his, it's basically his criminal history is how this case has been litigated. That is the basis on which Congress made the judgment that it was proper to disarm him. I'm not asking about what Congress did. I'm saying where in the record does it indicate that he individually poses a credible threat to anyone's physical safety? I think the record includes the criminal history. It includes what we've been able to get from a deposition. I'm not asking you to describe the record. I'm asking you to cite in the record, where in the record does he show himself to pose a credible threat to the physical safety of another? By being convicted of a crime punishable by more than one year and then by possessing firearms. All right, so everybody who is convicted of a crime that's punishable by a year and a day or more, it ipso facto follows that that person poses a credible threat to the physical safety of others. That's your argument. It follows that that person has both committed a serious crime and can be disarmed under Congress's categorical judgment. I'm asking you about, look, Rahimi of the Supreme Court used the word threat or some version of the word threat over I think exactly 30 times in its short opinion. The Chief Justice talked about how Mr. Rahimi posed a credible threat to the physical safety of others. Talked about that over and over again. I'm just trying to get a straight answer to the question whether this plaintiff poses a credible threat to somebody else. What I heard you say a minute ago was that by virtue of the fact that he was convicted of a crime punishable by a year and a day, he did. Is that your position? What I intended to say. I should say he does. By virtue of that prior conviction, he does pose a credible threat. What I intended to say was Congress made the judgment that felons as a category are dangerous enough that felons as a category can be disarmed. And what the principles underpinning the Second Amendment reflect is that a legislature can make that sort of group-based judgment, can be, and it doesn't necessarily mean that every person at every time who- I don't want to hang up on you, Mr. Stoddart, but I would really like a straight answer to the question too. You elided something that was put to you by Judge Hardiman. The question wasn't, did Congress decide whether people who are convicted of felonies are somehow convicted of serious crimes? We understand, you've said that many times in the course of your presentation. The question is, is it the government's position that anybody convicted of any crime, any crime, library book, jaywalking, in this case, I got too much for, I got food stamps more than I should have or I didn't deserve, any crime that you got more than a year and a day for, not, I take that back, not that you got more than a year and a day for, but that you could have gotten more than a year and a day for. Maybe you never spent one second in jail. That by virtue of being convicted of that crime, where the punishment was possibly a year and a day or more, you are ipso facto a danger, a physical danger to the community. Is that the government's position? And I apologize if I'm going in circles, I think that's all I can sort of say. It's actually a yes or no. You can say that's not our position and clarify it, you can say that is our position and clarify it, but you gotta start with a yes or a no. I think the answer to that is that that person is a member of a group that Congress can disarm. Could I ask a methodological question? I think in your brief, and again today, you've suggested that this felon in possession crime is old enough, it's about 80, 90 years old, that it's part of the regulatory tradition that we're looking at. Yes, and also I think it's helpful to keep in mind that all 50 states have similar laws today. Does Rahimi support that somehow, that a 20th century law is part of the tradition we look at to figure out the scope of the Second Amendment? Yes, so Rahimi tells us to look at principles and to figure out how those principles were applied, sorry, how those principles apply today. And when you extract the principle, I think it is useful evidence to show that that principle has been understood to permit felon dispossession laws for a century. The principles that we're deriving are coming from relevant historical analogs, right? I guess my question is, what's the government's position on the temporal boundaries of the relevant historical analogs? I don't think there's a sort of bright line in where you're looking to understand the original meaning. What I think that is helpful in this case to look at, and I would encourage the court to look at Justice Kavanaugh's concurrence, which points to a very long list of citations of Supreme Court cases that have relied on what you might call modern tradition, how government actors have understood the constitutional limitation to apply over the last 100 years. And when you look at that here, you see that there's 100 years of unbroken precedence of felon dispossession laws being passed. And you see that importantly, not only does that not sort of contradict anything from the founding era evidence, it's consistent with it, and there's nothing on the other side of the founding era evidence. There is nothing that shows that the founders thought if you were to pass such a law, it would have been unconstitutional. The original felon dispossession law was 1938, right? And then it was updated in the 1960s. Is that 1960s update also part of the historical tradition that we're deriving the principle from? It's part of the tradition of this country's laws, yes, for the reasons discussed in Justice Kavanaugh's concurrence. And I think one source that I'd like to just point out that I think might be helpful for the court to look at, and I see that my light has gone on. But we discussed in our brief the Livingston's proposed codes, which included the sort of felon disarmament laws, and were- They became law anyway. They did not become law, but I think the court has made clear in Heller and in other cases, you consult a variety of legal sources. I think this is a mistake that some courts have made in the wake of Bruin, is thinking it's a regulations only. No, you're trying to figure out what the original meaning of the constitutional right is. And so you look at things like what the founders thought of the pre-existing right to bear arms in the Pennsylvania Anti-Federalist Proposal. And you look at things like what one of the nation's early leading scholars whose work was specifically commended by Chief Justice Marshall. And you see that that's the understanding that the founders had. And it's important to recognize, just as with the domestic violence issue, there is not something on the other side that says there is a constitutional right of felons to possess firearms. Judge Krause has a question. Mr. Sury, when you put it to the principle of group disarmament, of sort of categorical disarmament power of the legislature, historically, it appears that there were, at least often, it's not always, mechanisms for an individual to come forward and make a showing. Whether you think about the taking of an oath or getting an official letter as to your character to be able to carry a firearm. So even if we were to accept the proposition that there is the power to presumptively disarm an entire category, what do we do with the, if we think it's a constitutional necessity, to have some individualized determination, the opportunity to have your Second Amendment right back at some point where the mechanisms Congress provided in the statute aren't reasonably available? So I think, importantly, to underscore that I do not accept the premise that this is constitutionally necessary, if the court were to conclude that such a process is constitutionally necessary, I think it would need to explain both why that is, notwithstanding the presence of founding-era laws to the contrary, and how that hashes out in a court's analysis of an as-applied challenge. And what I think Your Honor is describing sounds like a court would be doing something very similar to what ATF used to do under Section 925C before it was defunded due to the reasons we talked about earlier. And if the court were to say that is what is constitutionally necessary, but it's acceptable to keep a felon disarmed based on their felony at the front end, and you were doing that sort of back-end analysis, I think it would be very important to say that so that people understand on the ground whether they're subject to this law and how it's supposed to be analyzed and whether what you're looking at is the person today or is the crime that they committed however many years ago and some comparison to a founding-era crime 300 years ago. Judge Phipps has one. Thank you. I have a question about perspective as well. Rahimi, as I understand it, was a facial challenge. And what we've got here is an as-applied challenge. And so, facial challenges are kind of hard to bring. You have to slay or no negative every conceivable application of the statute. When Rahimi's given us guidance that seemed to say up the level of generality, why should we read that guidance as having any bearing on an as-applied challenge when as-applied challenges are always concerned with an individual's particular circumstances? It seems at one level we could say, oh, Rahimi, everything Rahimi says is what we do when we have facial challenge. But that's not today. That's not this case. This is an as-applied challenge. So why aren't we getting into, you're resisting all of these levels of granularity, you call it. I understand that. But that was a facial challenge. Why are those levels of granularity impermissible for us when we're by our nature dealing with an as-applied challenge? Because the way that Rahimi analyzed the case in that circumstance was it determined that the statute was constitutional as applied to Mr. Rahimi, and therefore it followed that the statute was not unconstitutional on its face. And so it's the same type of analysis that you will apply in any other Second Amendment case, including an as-applied case. You figure out whether the statute's application to the person in front of you is consistent with the Constitution. The Supreme Court said the principles support applying 922G8 to Mr. Rahimi. Applying the principles that we've talked about today, section 922G1 is constitutional as to Mr. Range. All right. Thank you. Thank you. And we'll hear a rebuttal. Thank you. Thank you, Your Honors. Just a few points on rebuttal. First, this is a methodological matter. What we view as the government's burden here is to A, they need to identify analogs, identify the historical tradition that they rely on. Then they need to extract principles from that tradition. And then they need to apply the principles to say it's valid to, in this case, disarm Mr. Range. And they cannot do that here. And first of all, they have not found analogs that are applicable in this circumstance. They mentioned Livingston. Not only was that not applied, but the punishment was that the person couldn't bear arms in the military. It did not even apply to personal arms. So that is wholly disconnected here. They've also talked about felony punishment. And they've said that the principle is serious crimes can be disarmed categorically. But that's just a sky-high level of generality, as I think we've seen. If that would result in people being indefinitely disarmed for things like jaywalking, or I think an example was given in the Falagetar dissent of an actual law removing a bottle of ketchup from the shelf, taking the cap off and putting it back on the shelf, I believe in New Jersey, that that would subject someone to lifetime disarmament. It's just absurd. Could you say then, what should we make of the presumptively lawful language that has been used repeatedly? Yes, so I would say a few things. One, I think all laws are presumptively lawful until they're challenged. That law was not at issue in Heller. So I think they're saying, yeah, we're not discussing that law. Two, you could go a bit further and say, well, we're presuming that law is going to be constitutional to some extent. And we're not making a facial challenge here. We're making an as-applied challenge. And three, that passage said longstanding laws disarming felons. This is not a longstanding law. Since 1961, it is not longstanding. The court didn't say 922 G1 is presumptively constitutional. And the government raised the issue of temporality. And it's clear that the text of the Second Amendment says that members of the people have a right to keep and bear arms. So they said there's silence at the founding. There's not silence at the founding. There's codification of that right. So the government needs to establish an exception. And that exception needs to have been present at the founding. As we have argued, as this court has held in Lara, some have said maybe 1868, which we disagree with. But regardless, that exception has to be in place at that time. And what the Supreme Court said in Bruin is that even if you assumed it could be 1868, late 19th century evidence is subject to very little weight and 20th century evidence, zero. So- You've acknowledged some longstanding prohibitions on firearm possession as a temporary matter. You've cited some, correct? Yes. Are there any permanent dispossession statutes that are longstanding? I am not aware of any. And I think the leading scholarly article on this is a Kevin Marshall article on why can't Martha Stewart have a gun. And he didn't identify any. I think it's a- You concede the 1938 Federal Firearms Act is one. You just say that's not longstanding, correct? Longstanding enough under Bruin. That is not early enough to establish a tradition. And that only dealt with violent people. And that only dealt with violent people. If we're talking felons, the definition of felon, we're dealing with the 1960 statute. Correct. And with respect to, I think, like a murder or something, it might be practically lifetime. That type of person would have a very hard time. But even with respect to felons, there is a disconnect here. Because Range's offense was a misdemeanor. The federal statute doesn't say felons are disarmed. It's anyone punishable, potentially, by over one year in prison. That is not the founding era definition of a felony. What Blackstone said is a felony is an offense which occasions a total forfeiture of either lands or goods or both at the common law, and to which capital or other punishment may be super added according to the degree of the guilt. So the government is trying to use this word felony and say that's a serious crime. But their definition of felony is totally different than the definition of felony at the founding. The theft of funds from the government constitute a felony under that definition at the founding? No, that was not a common law crime. I believe there was, and I'm not aware of any analogous felony. Again, the closest that they have come is obtaining funds by fraudulent means. That wasn't a common law offense. That was subject to imprisonment at the time. But in any event, we don't think those are valid analogs. Because again, the reason those people, to the extent they were disarmed, was as a side effect of their conviction. It had nothing to do with their Second Amendment rights. And that principle is too sky high of generality. And there is, unless you're going to say the Second Amendment is a second class right, which we know we can't, there would be no principle basis for cabining that to the Second Amendment. So that you couldn't say that anybody subject to a crime punishable by more than one year can be stripped of all of their constitutional rights indefinitely. And I'm sorry. I see my time has expired. Thank you, counsel. We'll take this case under advisement. We thank counsel.